## 23386.  HANKS *v.* THE STATE.

DECIDED MARCH 29, 1934.

*Roy V. Harris,* for plaintiff in error.

*George Hains, solicitor-general, John M. Graham,* contra.

MacINTYRE, J.  The indictment in this case charges that W. A. Hanks murdered Clarence Pearson on September 15, 1932, in Richmond county, Georgia, "by shooting him in the body with a pistol." The jury found the defendant guilty of voluntary manslaughter, his motion for a new trial was overruled, and he excepted.

A. P. Eldridge testified, in substance, that when he saw Pearson at about eight-thirty o'clock at night, about three minutes before he was killed, he was not armed, and "did not seem to be vexed over anything."  T. J. Mitchell testified, in part, that when he saw

Pearson going towards the place where he was shot he "seemed in a good humor," and that "right after that" he "heard some shots." This witness further swore: "When I heard the shot I looked up and they were clinched. . . There were three shots right in succession. . . I went to the restaurant and turned around and the other two shots were fired, and I looked and Mr. Pearson was lying on the sidewalk. The shooting was going on while they were clinched. . . I saw Pearson lying on the ground. He was lying on his back and I did not see anything in his hands. I saw the defendant standing right up there, and I did not see him have anything; and I did not hear him say anything. Pearson could not say anything, but I don't think he was dead. . . The first thing that attracted my attention was the shot, and I heard three in rapid succession. Then there was a pause for just a moment and two more rapid shots." E. O. Poss testified in part: "As soon as the first shot was fired . . I stepped out on the sidewalk. . . Mr. Hanks, so I understand, had Mr. Pearson with his left hand, . . had Mr. Pearson's right hand just like you would be going to tell somebody howdy . . and was holding to him, and made four shots with his right hand. . . Pearson appeared to be kind of edgewise . . to him . . and he held him until the last shot was fired, and he eased and gave way back down on the sidewalk. . . I did not see Pearson do anything to Hanks at all. That happened in this State and county. There was no pulling done, and Pearson was easing back to the ground, and Hanks was shooting at him. Pearson was standing with his side kind of towards Hanks, and kind of giving way in his knees." Doctor Irvine Phinizy testified in part: "One [bullet] entered from the left side and came through here. . . The bullet in the hands and the one in the leg did not cause death. . . He was killed by a bullet wound in the chest."

Doc Jones testified in part: "I did not hear Pearson or Hanks say anything. Pearson was in his shirt sleeves. . . When I looked around Mr. Pearson was trying to catch the gun to keep Mr. Hanks from shooting him. . . Mr. Pearson was going right to him to try to get the gun. They were tussling around, and there was some pretty fast work there." Jim Shipes testified in part: "I . . saw Mr. Hanks (immediately after the shooting), and . . said: 'You are under arrest; give me your gun.'

. . He unbreached it and handed it to me. . . All but one had been fired, and they found one shell on the ground. There were five shots, and this gun will shoot six times. There were five empty shells in this pistol, and this bullet fell on the ground. . . I understood him to say that the reason for the shooting was a family affair. . ." S. L. Gray testified in part: "Somebody in the crowd said: 'What did you shoot him for?' And he said: 'Family trouble, and I have no more to say.' If Pearson had anything I could not see it. He was in his shirt sleeves, and I couldn't see no gun or anything in his hands, or any visible weapon. . . I did not search Pearson's body." E. B. Barton testified in part: "I saw Mr. Hanks on Monday night before the shooting. He . . asked me if I had a gun. I told him 'No.' He asked me if I had one at home, and I told him 'Yes.' He asked me if I would let him have it, and told him 'Yes.' And I finally asked him what he wanted with the gun, and he said there was a fellow he had to get." Henry Potter testified in part: "I had a talk with Mr. Hanks on Saturday night before the killing happened on Thursday. I saw him in Mr. Pearson's place. When I came out of the place Hanks came out too, and me and him set down on some little boxes. . . He said: "You seen that dam little S. O. B.?" I said: "Who do you mean?" He said: "Pearson . . I am going to kill that S. O. B. before Saturday night." Hayden Freeman testified in part: "I work at the coroner's office, and when the body of Clarence Pearson got there I examined his clothes, and he had no pistol of any kind on him. He had . . a two-bladed knife closed."

S. M. Cobb, sworn for the defendant, testified in part: "I heard Hanks say: 'Don't come on me,' and . . Hanks had his hand out, and Pearson pulled up his arm . . and run into him . . and clinched him, and then the pistol went to shooting. . . I could not be certain who was doing the shooting. . . Hanks never moved from his position under the light post, and Pearson came right on him. Pearson was a small fellow and Hanks was a big fellow. I did not see Pearson with anything, and I did not see any gun. When the pistol fired they clinched and the shooting began. . . I did not hear Hanks say: 'I shot him for family trouble.'" Charlie Sanders, sworn for the defendant, testified in part: "I was in Mr. Pearson's place of business on Thursday or

Friday night before he was shot the next Thursday by Mr. Hanks. They had a little argument, and Mr. Pearson walks around there and gets his gun and runs me and Hanks out." Eugene Shaw, sworn for the defendant, testified in part that he had not seen Pearson for two or three years before the homicide in question, but that up to that time he always carried a gun in his bosom, and had the reputation of being "violent and turbulent," but that he did not know what his reputation had been for the last two or three years. J. E. Grant, sworn for the defendant, testified in part that "nearly every time" he saw Pearson, "he either had a pistol in his pocket or in his bosom," and that "his reputation for violence . . was bad." Bill Passon, sworn for the defendant, also testified that Pearson's reputation for violence was bad.

After stating that he had been told that Pearson had threatened to kill him, and that Pearson had on a different occasion drawn a pistol on him, the defendant, in his statement to the jury, gave the following version of the occurrence: "I was standing on the corner waiting for a taxi to go home. . . He came across there and hit the sidewalk about thirty feet from me . . and put his hand this way and turned square to the right towards me. I told him to stop. . . He come right on up. I told him the second time to stop, and he carried his hand up this way and ran into me, and I got my gun and went to shooting at his legs. And he come right on and got the gun, and I knowed he was dangerous all the time. He come and got hold of the gun, and in the tussle he got killed, and I don't know how it happened. I am sorry of the whole thing. I had nothing against him, and that is all I know about it."

■ The foregoing statement of the evidence presents the substantial features of the case. There can be no question that the evidence supports the verdict, and we hold that the court did not err in overruling the general grounds of the motion for a new trial.

■ The first special ground of the motion for a new trial complains of this excerpt from the charge of the court: "Now, I give an entirely distinct piece of the law. The law says under what circumstances, and what must exist, when it will reduce a homicide from a higher offense to a lower offense; and if there is any lower offense in this case, it is voluntary manslaughter." We do not think that the word "homicide," as used in the charge, "implies criminality on the part of the defendant," even though that word was

not defined by the court. Neither do we think there is any merit in the assignment that the language used by the court left "the impression on the minds of the jury . . that any homicide was an offense against the laws of the State, and that the defendant was guilty of the lower offense of voluntary manslaughter."

■ The next assignment of error under special ground 1 is that the charge given deprived the jury "of the right to say whether under the facts of this case the defendant might or might not be guilty of involuntary manslaughter." We have stated the evidence rather fully in order to avoid repetition. We see nothing in it to warrant a charge upon the law of involuntary manslaughter. Indeed, we do not think that the defendant's statement injects that theory into the case. The law as to when involuntary manslaughter is involved in a case, and when not, and when a charge should be given upon that offense, is so thoroughly covered by the Supreme Court in *Carter* v. *State,* 171 *Ga.* 406 (1), 410, and the numerous citations therein, that it appears to be unnecessary to do more than cite that case. In that case the court said: "There is nothing in the evidence to show that the killing in this case was unintentional. If this grade of homicide was involved, it arose from the statement of the defendant, to the effect that when he inflicted these numerous wounds on the person of the deceased he did not know what he was doing. Where there is nothing in the evidence to indicate that the killing was not intentional, and where no charge is requested on that subject, involuntary manslaughter is not an issue in the case, and no allusion should be made to it by the judge in charging the jury, even though the prisoner's statement by indirection suggests such a theory." We hold that the court did not err in failing to charge the law of involuntary manslaughter, or in substantially instructing them that that offense was not in the case.

■ In special ground 2 the following charge is complained of: "Now, in order to reduce a homicide from the higher grade to that lower grade, here is what the law says must exist before you can reduce it. In all cases of voluntary manslaughter there must be some actual assault upon the person killing, or if not that, an attempt by the person killed to commit a serious personal injury upon the person killing, or if not that, other equivalent circumstances to justify the excitement of passion and to exclude all idea of deliberation or malice, either express or implied." The charge is not fairly sub-

ject to the criticism that the language used in it "is calculated to lead the jury to believe that every homicide is an offense . . and to exclude from their minds any idea of justifiable homicide." We hold that there is no merit in special ground 2.

■ Special ground 3 avers that the trial judge committed error because he "failed to charge the jury the law of justifiable homicide, or to explain to the jury that there was such a thing as justifiable homicide." The court charged the jury : "The prisoner enters in the trial of this case with the presumption of innocence in his favor, and that presumption remains with him throughout the trial until his guilt is established by the evidence beyond all reasonable doubt." The first form of verdict given the jury by the court was : "We, the jury, find the defendant not guilty." Furthermore, the court instructed the jury under what circumstances the defendant would be "justifiable" if they found that he killed under the fears of a reasonable man, and apprised them of the fact that "a seeming necessity, when acted upon in good faith, is the equivalent of a real necessity;" instructed them that if they believed from the evidence that the defendant killed in self-defense they "should acquit him;" and further instructed the jury on the law of "misfortune or accident." It thus appears that the court concretely applied the law of "justifiable homicide" to the facts of the case; and we hold that ground 3 discloses no cause for a new trial.

■ Special ground 4 avers that the trial judge committed error in charging the jury as follows : "The defenses set up here are three : one is self-defense; one is that of the fears of a reasonable man; and the other is accident." The substance of the assignment of error in this ground is that the charge left the jury under the impression .that "only one of these defenses could be true," and precluded the contentions made in the defendant's statement that "he shot at the legs of the deceased, and that he had a right to do so in order to protect himself, either by reason of an actual necessity or an apparent necessity, and that after the deceased and the defendant engaged in a struggle over the gun, and during this struggle the deceased was killed, and the defendant did not know that the actual killing occurred." It is further urged that under the defendant's statement, his "contentions should have been submitted to the jury, and the jury should have been allowed . . to determine whether or not, if the gun was fired by the defendant

. . , if the firing was accident, or whether the gun was fired by the deceased." There was no request to charge, and, in our opinion, the charge of the court as given sufficiently covered the issues in the case and the law applicable thereto. We hold that special ground 4 is not meritorious.

■ Special ground 5 complains of the following charge: "I charge you . . that if you believe from the evidence in the case that the defendant killed the deceased in his own self-defense, then you should acquit him, or if you believe that when he killed him he killed him under the fears of a reasonable man that some bodily harm was about to be done him amounting to a felony, and that he acted under the influence of those fears and not in a spirit of revenge, then he would be justified, and a seeming necessity, when acted upon in good faith, is the equivalent of a real necessity." The assignment of error is: "This portion of the charge excepted to is error for the reason that it excludes from the minds of the jury the idea of the existence at the same time of both the elements of self-defense and the killing of a person by one who acts under the reasonable fears that either there was an actual necessity or an apparent necessity for the killing." The charge appears to be favorable to the defendant, and is not, we think, subject to the criticism made on it.

■ Special ground 6 complains that the court erred in "failing to charge . . involuntary manslaughter in the commission of an unlawful act"—that the jury should have had the opportunity to determine "whether the killing was the result of an illegal shooting at the feet of another." It appears from the defendant's statement that after he began shooting at Pearson's legs, "he come right on and got the gun," and that "in the tussle he got killed." Doctor Irvine Phinizy testified: "The bullet in the hand and the one in the leg . . did not cause his death. He was killed by a bullet wound in the chest." We hold that this ground is not meritorious.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*